JOSEPH W. POWELL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 73763. Promulgated June 3, 1936.

*C. J. McGuire, Esq.,* and *W. C. Magathan, Esq.,* for the petitioner.

*T. F. Callahan, Esq.,* for the respondent.

658

OPINION.

MURDOCK: The petitioner lived near and conducted his principal business activities in Boston during 1930. He also spent about three days of each week in New York, where he managed two corporations and was also active in trying to arrange a consolidation involving one of the companies. He received a salary of $20,833.30 from one of the corporations during 1930 and he also received a small amount for his services to the other. He attended directors' meetings in New York and elsewhere during 1930. Most of the expenditures in controversy were made for railroad fare to and from New York and for board, lodging, and other living expenses while the petitioner was in New York.

The Commissioner concedes that the petitioner expended $9,442.38 in traveling, for food and lodging, and for other necessary purposes while away from home. His whole defense, as stated at the trial, is that the expenditures "were not in connection with the petitioner's trade or business" and, therefore, were not deductible as ordinary and necessary expenses of carrying on any business. His point seems to be that the petitioner has not shown that he had any recognized business to which these expenses could be related. However, the evidence shows that the petitioner was earning salaries and other income for services performed in New York while his home, and principal place of business, was in Boston. The Board has allowed similar deductions under similar circumstances and on authority of its earlier decisions the present deduction is proper. *D. C. Jackling*, 9 B. T. A. 312; *Chester D. Greisemer*, 10 B. T. A. 386; *Walter F. Brown*, 13 B. T. A. 832. Cf. *Mort L. Bixler*, 5 B. T. A. 1181; *Fred Dennett*, 7 B. T. A. 1173; *Charles E. Duncan*, 17 B. T. A. 1088; affd., 47 Fed. (2d) 1082 (without opinion); *Elmore L. Potter*, 18 B. T. A. 549.

The Commissioner refuses to allow deductions for the alleged losses on the stocks and notes. He says, among other things, that the sales were not genuine, the dispositions were not final and complete, the petitioner never intended to permanently part with title to and dominion and control over the property, he never did effectively part with the property, and, not having completely and finally disposed of the property, he sustained no real loss. A taxpayer who makes

a final and complete disposition of his property for less than cost has sustained a loss and is entitled to deduct it. This is true even though the buyer is closely related to or associated with the seller and the sale is made to realize a loss for income tax purposes. But, where one taxpayer sells and another, whose interests are closely allied to those of the seller, purchases identical property, even though both act through brokers, the transactions need careful scrutiny to determine whether the property was really disposed of without strings by which it might later be controlled, or, perhaps, reacquired.

It is fitting and proper to subject the petitioner's transactions to careful scrutiny to determine the real effect of what he did. The beneficiaries of the trust were his wife, his son and himself. The interests of the trust were closely allied with his own. He had the power within himself to reacquire property from the trust identical with that which he sold. He did not have to have any agreement or option with any third party to repurchase. If he made the first transfer with an intention to reacquire after the 30-day period provided in section 118 of the Revenue Act of 1928 and carried out that intent, it would appear that the property was never disposed of unqualifiedly. The only evidence in the record of his intention is his testimony, that he did not intend to reacquire any of the property, and his acts. Sometimes the acts of an interested witness speak louder than his words. Such is the case here.

The petitioner and the trust were separate taxable entities. The petitioner did not sell any of his stock directly to the trust. Transactions between them would have their usual legal significance for income tax purposes. Cf. *Lee B. Foster*, 22 B. T. A. 717. The sales were made at market prices. If he had never reacquired any of the property directly or indirectly from the trust he would be in no difficulty. Cf. *William H. Albers*, 33 B. T. A. 373; *A. R. Glancy, Inc.*, 31 B. T. A. 236; *Merritt J. Corbett*, 16 B. T. A. 1231; *Jones v. Helvering*, 71 Fed. (2d) 214; certiorari denied, 293 U. S. 583. If he had reacquired it from some other source after thirty days or if he had reacquired a part of it from the trust and had given some good reason for so doing, he might still get his deduction. But the facts are that shortly after the 30-day period he reacquired in three different transactions the same amount of the same kind of stock that he had sold, he reacquired it either directly or indirectly from the trust, and the explanations which he gave for his three sudden changes of mind are not convincing. A change of mind in regard to reacquiring one stock would not be so difficult to understand, but three changes out of a possible three tax one's credulity, particularly in the absence of a good explanation. Cf. *Harold F. Seymour*, 27 B. T. A. 403; *Commissioner v. Dyer*, 74 Fed. (2d) 685; certiorari denied, 296 U. S. 586.

Furthermore, the evidence in regard to the notes destroys our confidence in the testimony of the petitioner as to his intention. His claim of a loss on the notes is not respectable. The petitioner knew that the notes were worth far more than $25,000. They were, in his opinion, worth about their face value, $41,000. He did not have even a potential loss on them. He had no intention of allowing them to go to an outsider for less than about $40,000. He knew everything about them, whereas no other bidder at the auction was likely to know much about them. Any bid he made would probably have been successful. However, he took no risk. He instructed his agent to buy them for the trust, even though the agent had to bid up to the face amount of the notes. There were no other bidders and the bid of $25,000 does not establish their fair market value. He might just as easily have fixed some other price. His reason for fixing the opening bid at $25,000, and thus limiting his "loss" to about $16,000, does not clearly appear. But he needed a loss of about that much in order to completely offset his substantial ordinary income for the year and show on his return no net income subject to tax. Here again he says he changed his mind and decided to acquire the new note from the trust, but he gave no good reason for the change in intent. If he paid the trust $20,000 for the note which he subsequently acquired, then at best he merely made the trust a present of $20,000. A gift does not create a loss. He must have known that he sustained no loss on the notes. Yet he claimed a loss of $16,052.25, and now attempts to substantiate it.

The petitioner cites *Jones* v. *Helvering, supra,* and *Marston* v. *Commissioner,* 75 Fed. (2d) 936, reversing 29 B. T. A. 976. The *Jones* case is distinguishable for in that case Jones did not reacquire any of the property which was transferred to the corporation. The *Marston* case is in some respects parallel with the transaction which the petitioner had in the notes, but it is, nevertheless, distinguishable from that feature of the present case. The court there pointed out that the shares involved had depreciated in value and the petitioner had tried to sell the stock but could find no market. There was other evidence to show that the property disposed of had depreciated in value until it was worth but a small part of its original cost. A part of it was never reacquired, and a reason satisfactory to the court was given for the reacquisition of the other block of stock. The notes in the present case had not depreciated in value, and the petitioner had made no effort to sell them. The auction price was no guide to their fair market value. The petitioner had not even a potential loss in the notes. The present case is more like *Shoenberg* v. *Commissioner,* 77 Fed. (2d) 446, 449, affirming 30 B. T. A. 659; certiorari denied, 296 U. S. 586. The petitioner in that case sold securities at market through a broker and at the same

time had a corporation which he controlled purchase identical securities at the same price. After the lapse of 30 days he reacquired the shares from the corporation at the then market price. The court said:

A loss as to particular property is usually realized by a sale thereof for less than it cost. However, where such sale is made as part of a plan whereby substantially identical property is to be reacquired and that plan is carried out, the *realization* of loss is not genuine and substantial; it is not real. This is true because the taxpayer has not actually changed his position and is no poorer than before the sale. The particular sale may be real, but the entire transaction prevents the loss from being actually suffered. Taxation is concerned with realities, and no loss is deductible which is not real.

The court discussed the purpose of section 118 and held that the taxpayer had not sustained a loss because in the end he held the same securities which he had held in the beginning. There was no testimony in that case as there is in this one that the taxpayer did not intend to reacquire the property, but otherwise the two cases are very much alike. The facts in this case convince us that all of the transactions were but a part of a plan which the petitioner devised.

Taking all of the evidence into consideration, we hold that the petitioner never intended to finally and completely dispose of any of the stock or notes, the sales were not final dispositions but mere steps in an ineffective plan to establish losses for income tax purposes, and the petitioner sustained none of the alleged losses in the year 1930. The Commissioner did not err in disallowing the deductions. Cf. *Shoenberg* v. *Commissioner, supra; Luella Hoyt Slayton*, 29 B. T. A. 931; affd., 76 Fed. (2d) 497; certiorari denied, 296 U. S. 586; *Rand Co.*, 29 B. T. A. 467; affd., 77 Fed. (2d) 450; *Commissioner* v. *Dyer, supra.*

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

SMITH, dissenting: I am of the opinion that the petitioner sustained deductible losses upon the sales made by him of his shares of stock in the American-Hawaiian Steamship Co., the Atlas Tack Corporation, and the Manhattan Co. *Marston* v. *Commissioner*, 75 Fed. (2d) 936.

Since the seller and the purchaser were the same individual, though acting as separate taxable entities, it may be that an intention to repurchase, if it existed at the time of the sale, would contradict the fact of a then juristic sale, or legally premise the existence of an option to repurchase, if the securities sold were actually repurchased. See *Shoenberg* v. *Commissioner*, 77 Fed. (2d) 446, 449, affirming 30 B. T. A. 659; certiorari denied, 296 U. S. 586, and *Commissioner* v.

*Dyer*, 74 Fed. (2d) 685; certiorari denied, 296 U. S. 586. However, even if that be true, the existence of that intention at the time of the sale is the essential factual premise of that conclusion. I think this record disproves the presence here of that fact.

Both the sales to and repurchases from the trust were made *at market*. That fact, in my judgment, on this record, conclusively corroborates petitioner's testimony that when he sold the stocks to the trust he had no intention to repurchase them. *Marston* v. *Commissioner, supra*. No case is cited in the prevailing opinion, nor do I know of any which dispute that position. The sale of the notes with a then purpose to repurchase them certainly is not evidence of the existence of a similar intent with reference to the wholly separate and unrelated stock.

The *Shoenberg* case, *supra*, upon which the prevailing opinion largely relies, is distinguishable in that, though the sale and the repurchase there were made at market, the seller advanced to the buyer a large part of the consideration with which the securities were bought. And, in the *Dyer* case, *supra*, likewise relied upon, the repurchase did not occur *at market*.

LEECH agrees with this dissent.